Good morning everybody. Good morning, Your Honor. We're going to commence today with case number one, Mondelez Global v. NLRB. This is appeals numbered 20-1616 and 20-1701. We're going to begin with the appellant, Mr. Shudroff. Good morning, Your Honors, and may it please the court, I respectfully request five minutes for the company's decision to lawfully terminate five employees for time theft at its Fair Lawn, New Jersey facility. The board's Section 8A3 findings are not based on substantial evidence or a reasonable basis in law. In this case, the company initiated an overtime study, generated a report demonstrating several employees, including three union officers, had engaged in time theft and terminated those employees. Those three union officers were thus not singled out. Because of their union activities. In this case, the board failed to follow its own right-line mixed motive burden shifting test. With respect to the knowledge element, it is noteworthy that the person who initiated the overtime study had no idea about the discriminatees union activities and there is no evidence that anybody directed him to focus on these three particular discriminatees. As to causal connection, this court has held in the AutoNation case in 2015, that there must be a causal connection between union animus and an adverse employment action. And in this case, the board did not participate, I'm sorry, the board did not follow that particular analysis. Instead, it focused exclusively on a relationship between the union activities and the adverse employment action. And that's, in this case, the board's reliance upon animus is not founded, is not supported by substantial evidence. Instead, the board relied upon generalized non-threatening remarks and based on evidence that happened early in 2016, months before any adverse employment action was taken in this case. Also, this court has noted that an abstract dislike for unions is insufficient. And the company submits that the board relied exclusively on that type of evidence, where it was more of an abstract dislike than anything that was actually causally connected to the employees' ultimate suspensions and terminations. Mr. Shudroff, does the record reveal why the overtime investigation ceased after the three discriminatees were terminated? Yes, Judge Brennan, the record reflects that the individual who was in charge of the overtime study had other personal commitments to focus upon, and that was the end of the study. That doesn't make a whole lot of sense to me. And the reason is because Mondelez is a very, very substantial corporation. And for them to invest the time and the resources into this overtime inquiry in fair law, and then have an individual say, well, I've had something personally come up, for the company to respond to that by cancelling the study makes no sense to me. Things come up with people all the time, personally, and in an enterprise like Mondelez, you just substitute somebody in and you finish the inquiry. Your Honor, well, for the first part, Mr. Belgar, who was in charge of the overtime study, first figured out that there was an issue with regards to who was figuring out how overtime was, I guess, assigned. And early on, as part of the study, decided to make sure that the only one manager would have responsibility for assigning overtime, one supervisor, that is. So once that part of the equation was handled, there was still an overtime, there's still excessive overtime. And as part of this study, the time theft that was uncovered was one of the principal reasons why there were drivers of with respect to how much overtime was being... But the company's position is not that the overtime study came to conclusion and resulted in all final reporting and final findings and all of that. I mean, the company seems to acknowledge that there was a personal reason come up with Mr. Belgar, and after that, the study just didn't run out any further. That's the part of this that Your Honor... It's almost like he said, well, I have to go to a funeral, and the company said, well, we'll cancel a multi-million dollar study. Well, Your Honor, I mean, as far as the study goes, I mean, it was still completed based upon the results. There was an output... So the company's position is that the study ran its intended course as it was charted at the outset and culminated as planned at the outset? I don't believe that that is ultimately in the record as far as what the initial I guess purpose was and what it ended up being, but studies like that happen all the time, where there's an initial focus on something and then it changes into something else. But it doesn't mean that there was any kind of unlawful motive underlying the actual... I'm not saying unlawful motive. What I'm saying is that when a very large company invests substantially in an overtime expense study at a plant and then abandons it because of a personal issue that has come up with the investigator, that's not the ordinary course. I understand your point, Your Honor. It's just, again, the company submits that it wasn't that there was any kind of unlawful motive underlying the study and that these types of things happen all the time. No one's arguing that there was an unlawful motive. A company's perfectly entitled to look into overtime expenses at a plant There's nothing illegal about that. So I guess the issue, Your Honor, is that the company ultimately determined that there were instances of time theft and that was one of the drivers of the overtime. I think what Judge Brennan is asking is it's pretty fishy that the study cut off. I mean, that's the way I interpret his question is it doesn't make a whole lot of sense. So what's the company's explanation? Your Honor, other than that there were personal reasons and that there were other focuses, other organizational focuses, that's the explanation. And there's no record on it other than, quote, personal reasons. Other than Mr. Malgar's testimony, that's correct. There is also no evidence in this case that the the hostility that the the board relied upon in determining that the right-line prima facie burden was satisfied had anything to do with, I'm sorry, that there were no alleged Section 881 charges concerning that conduct. And it would seem that if there was some kind of real hostility, the union would have filed some kind of unfair labor practice charge and did not. Also, these, as I mentioned before, the purported hostilities took place months before the actual adverse employment actions in this case. And as this court has noted in the Sears Roebuck case, you know, why would the the company wait so long? And also, these three discriminatees have been union officers for a very long time. It's not as if they had just all of a sudden become union officers. And so, if they, if the company really harbored some kind of animus against them, it would have, logic would suggest that it would have taken action against them way sooner than it did. And it didn't. There was obviously a break in the causation. And the other piece of the, there was another break in causation, which was that in May of 2016, there was the additional uncovering of the time theft. In addition, your honors, the investigation that the company initiated once it received Mr Melgar's report was entirely proper. Uh, the board and the union are, in this case, are seeking to second guess how the company ultimately conducted its investigation into the employees, including the three union officers and including the other two non union supporters who were still members of the union, but not union activists. As far as their, uh, the investigation into their conduct, there's nothing to suggest that the employees who were not union supporters were treated any differently in that regard. With respect to the investigations, the union officers were asked about their whereabouts and couldn't provide credible answers. Um, and the company afforded the union representatives or the, I guess the union activists an opportunity to have a union representative present. Uh, so these were all things that were hallmarks of a investigation. The fact that ultimately the company determined that the three discriminative tease were not credible and determined that they the ultimate penalty of termination was appropriate is completely sound. In this case, there's another issue with respect to disparate treatment. The board claimed the board found that or the board, I guess I should say, ignored the fact that there was a disparate treatment issue here with respect to the two union activists who were terminated the same time for the same infractions as the three discriminative tease. The administrative law judge briefly touched on it, and the board's order adopting the L. J. S. Findings didn't even mention either of these two employees. And that's somewhat of that was somewhat shocking to the company in the sense that, at least from this court's perspective in the Sears robot case there back in, um, in 2003 that there was evidence that there was a comparator who just didn't wasn't mentioned by the board. Um, and that is a significant portion of this case in that the union could not. I'm sorry. The company could not have demonstrated animus against those individuals. The three discriminative tease if it's simultaneously treated to non discriminative tease the same way in connection with the same adverse employment actions for the same types of misconduct. Also, there's evidence that there were many union activists, many shop stewards who engage in the same union activities against the same. I'm sorry, engage the same union activities as the discriminative tease and we're not subjected to any discipline. And, of course, the difference being is that those individuals of those other shop stewards did not engage in time theft. So in some on this point, the company submits that the board's order failed to, uh, qualify, failed to was not supported by substantial evidence or a reasonable basis in law that the board's general counsel would have satisfied its its initial right line burden in this regard. Um, additionally, the board, uh, summarily adopted the administrative law judge's findings that the company would not have terminated the employees regardless of their union activities. In other words, that there was no legitimate reason for their discharges. But as I think all can concede here, time theft is a cardinal sin in the workplace. It's one of those hallmark violations. Um, the discriminative tease and the two other employees who were terminated did not have adequate explanations for their whereabouts. And even if the company was ultimately mistaken in its conclusions, it does not mean that it had any kind of unlawful motive in that regard, as far as whether or not it would have terminated these employees regardless of their union activities. Mr. Shoe drop. What is the record show with respect to past instances of time theft or misreporting time? So, you know, in the periods well before this dispute arose, surely this wasn't the first time there was an issue with, um, did the company automatically terminate upon finding time theft in prior periods, or did it undertake more progressive forms of discipline as the union suggests? There were instances where there were other cases where there were instances of time theft or falsification of records that did not end up in terminations. But in those cases, it wasn't there was not necessarily an uncovering of intentional intent to engage in theft of time. And that's what just, I guess, distinguishes those cases from this and that it's hard to compare apples to apples because here the correct, I think the company submits at the correct application of, I guess, the disparate treatment. Are you saying the prior instances were instances of negligent time theft, and this is purposeful time theft? Is that the distinction? Well, I there was no malicious intent, I should say, Your Honor. I don't know what that means. So, Your Honor, for instance, if there was an example where somebody handed somebody a time card and both persons entered at the same time, in this case, with the three discriminatees, the evidence showed that the individuals were out of the facility for significant periods of time and unaccounted. Well, sure, my question, but my question is, in the past, in the past, there's not, there's not one example of somebody that the company determined was engaged in knowing or intentional miskeeping of time? I don't believe that the record suggests of anything this egregious of what the company discovered with respect to these three discriminatees. So, and that's what distinguishes this case from others because the company reserved the right to discharge employees for, you know, its own management right under the circumstances. And it determined in this case that the circumstances warranted summary termination as opposed to a lesser disciplinary offense. Switching to the, I'm sorry. I also note that union activism in and of itself with respect to these three in other words, it should not be that merely because somebody is a union activist, let's say a union officer of any sort that does not permit the employee to walk around with without a level of invincibility. Uh, that if the person engages in time theft, the person can be discharged without really underlying determining whether or not there's an underlying issue or not. As far as whether there's, uh, it was motivated improperly. It does not serve as a shield in that sense. Switching to the section 8A5 findings, the board erred in finding that the company could not attend its own new employee orientations. There was no material change here dealing with a mandatory subject of bargaining and the union still had access to new employees. The company likewise did not unlawfully change its return from the short term disability policy. Here there was also no material change. Employees needed to provide 24 hours of before a scheduled shift and there was no evidence. I'm sorry, there was no finding that the employees were on short term disability. They would have no scheduled shift upon their return. Well, Mr Shudra, if I don't know if the metric is material change as much as it is whether or not it's the subject of bargaining. Correct. Correct. Your honor. While maybe that there's a way the law reads from from the board's perspective is that there might be a mandatory subject of bargaining, which would ordinarily necessitate bargaining, but not all changes to material. I'm sorry, not all changes to mandatory subjects of bargaining are necessarily, uh, uh, material changes such that they would material change because employees had never been on a scheduled shift or could not have been on a scheduled shift while they were on short term disability, and the company scheduled issued its schedules once per week. So there would be no way to allow for somebody who was not who didn't have a scheduled shift to not provide the time to not timely provide their return to work for him. Similarly, the company did not unlawfully change. It's the shift times with respect to the B. N. R. Processors. The company in good faith followed the collective bargaining agreements directive to maintain uniform shift start times, which it did in this case. Also, the company did not unlawfully refused to furnish information. In this case, there were two requests for information, one dealing with clock in and clock out records, which was also the subject of a simultaneous unfair labor practice charge, which that was one of the reasons why the company withheld the information because it was designed for pre hearing discovery. Um, and the other reason, I guess, and the other information request dealt with, um, new higher information, which the company ultimately agreed to provide and did provide. And because of the burdensome request, there was no, uh, there was delay, but it wasn't in Norton Mandalay. And there was the delay was explained under those circumstances. You agree the delay was a period of Yes, you're right. There was. There was a delay. But given the unduly burdensome nature of the request, the company submits that that was a reasonable amount of time to respond. Does the record reveal whether there was a meet and confer any type of negotiations with regard to the scope of the request to make it manageable? Um, I'm not certain whether or not there was a record on that point, Your Honor. Was the seven month was the seven month delay. The did that relate to the second information request on new hires? Yes, Your Honor. What's I don't understand what's so burdensome about that. It would seem that somebody in five minutes could jump on the computer and tell you who they've hired since a particular date. Your Honor, it was just the nature of the request as far as going back and figuring out all that information. I don't sorry. I may be mistaken about that. The delay may have also been attributed to the clock in and clock out on that point, because that was and that would have been a much more laborious test. I mean, that's that's fair. Is that yes, is the seven that would be much more difficult. You're right. The new hire information. It was the the clock in and clock out, um, documentation because that would require substantial review and undertaking to uncover the issues that the union was seeking requests. But there was some delay, was there not? Or some reluctance to turn over new hire information from some particular date? Yes, Your Honor. But ultimately, it was turned over in pieces on a supplemental basis. Okay, that's what I think that's what they're saying. It doesn't make any sense. We're entitled to that information. You can snap your fingers and produce it. Yes, Your Honor. And ultimately, the company submits that it was ultimately produced to the union in this case. So, um, 11 other one of the pieces of the board found that these section 85 findings somehow had a causal connection to the section 83 findings in the company submits. There's in accordance with this court's decision in automation, there would be no causal connection between these completely unrelated failure to bargain charges or allegations and the three discriminatees discharges. Um, so for these reasons, your honors, the company's petition for review should be granted. The board's cross application should be denied, and I respectfully request the remainder of my time for rebuttal. Thank you. Thank you. The be reserved for a bottle will now move to Miss Sheehy on behalf of the board. What are your honors? Please? The court volume. Okay, it is. Okay, it's always hard to gauge in this house. So, um, I just want to use the beginning of my time here. Unless the court has any immediate questions, I'm going to use my time to clear up. I think some misconceptions and some things that we disagree with what the representations were there during opposing counsel's So first, um, and I'm not gonna take everything exactly in order. But first, I'm gonna start with the disparate treatment and this argument that the fact that two union activists not sorry, non union activists were also caught up in this investigation. And I think there's a footnote in the employer's brief about representations that the board made in its brief, and I just want to clarify this. So there were the three union officials. No dispute about that. There was a fourth individual who got who was the one who dragged Gutierrez or I guess how Gutierrez got caught up in it. And that man's name is Karskosky. He's a non union official. So those four were terminated. Then there was the so it's reasonable, right? If you're gonna have the three union officials how I don't understand how the employer could defend not firing also the individual who actually swiped Gutierrez his badge. So I mean, I don't know that that's a real good comparator to look at Karskosky because I don't know how the employer would defend terminating Gutierrez but not the individual who actually swiped his badge. So I don't think he's a good comparator. Then there's also the union or the non union official who was first on the lists for most egregious offenses, according to Melgar's list. And that's Namowski. Namowski retires before any action is taken against him. So we don't know what the employer would have done. I know they're saying we would have terminated him. We know that he was within the scope of the investigation. We also know that he was the most egregious on Melgar's list. Hold on, what's that guy's name? Namowski. I think it's it's the Zoran. His last name is N-A-U-M-O-S-K-I. Not the Manevsk or Manevski. No, I'm going to talk about him right now. So you're on is correct. There was also Manevski, who was a non-union official who was terminated. But the record reflects that he was not within the scope of Melgar's focus. Melgar's PowerPoint presentation had the three union officials, Koroskovski, the one who swiped Gutierrez's badge, and Namowski, the retired one who was the found himself also getting discharged for time and offenses. And to be fair, he's on the lists. He is not the focus of Melgar's study. Melgar very clearly testifies that he only looked at Manevski after HR came to him and said, hey, Manevski's supervisor believes that he is engaging in time theft. Can you have a look at your records and see if those files or those data points bear that out? So again, I don't think Manevski. So in our brief, we do say that there were the three union officials and Koroskovski and the retired employee. We didn't include Manevski in our representation about the study because in our view, he's not part of that. His involvement came at the behest of a supervisor. So I just want to make that very clear. To the extent the brief wasn't clear on that, I wanted to clarify that. We didn't want to mislead the court. So on that point, on the disparate treatment, I don't think the employer has a good case for comparators. If you look at the circumstances surrounding the other people who were terminated, or if you believe that they would have also let go of Manevski, the circumstances for his involvement in the study as well. Ms. Sheehy, can I ask you a question just to get a little context around that study? Sure. So as I understand it, the company commissioned Mr. Melgar to undertake this inquiry because of the high or rising overtime expenses at the Fair Lawn facility. Is that right? That's certainly what Melgar testified. In his experience, I think that overtime was 30 to 35% higher, I think, than other North American facilities. Okay. And when Melgar came in and he did some initial diligence, he ran a list of 59, right? Or he came up with a list of 59. That's right. But it narrows. It narrows down to this, whether you count it as five or six, but it narrows over time. It narrows, right. So the 59, I think what he testifies to, and I'll admit to being a little unclear because some of the phrasing doesn't, I don't fully understand all of it, but I think the initial 59 are coming from who had a lot of overtime hours. Right. So my point is, if his responsibility or his charge was figure out why we're 30 or 35% high in overtime in this particular plant, it seems very unlikely to me that the explanation would be, well, there's five or six people that are running the clock through the roof. I don't think five or six people could cause an increase like that. I mean, they'd have to be working 24 hours a day. And so my question is, it seems odd to me that this inquiry narrowed to five or six, if what you're trying to pinpoint is the cause of a 30 or 35% overtime run. I couldn't agree with you more. And I think the board does as well. That's the very first part of the board's analysis where they say, listen, nobody's criticizing your study. It's sure, figure out why you're paying way more overtime than other facilities. But at some point when you get these 59 names on a list, and you ultimately don't even look at that, when you even narrow it to the five or six, so forget you have 59 people that in a 16 week period had very high overtime hours. You don't even look at those 59, which on a broader scale, I suppose, isn't that the question the company, the company is trying to ask whether on a, on an America's basis or more worldwide, the focus has got to be why are we incurring so many overtime, so many heightened labor costs at this particular facility? And Melgar doesn't answer that question. He doesn't at all. No. And I think that's a very big point of frustration for the board in trying to figure out why you engage in this study. And it's starting to look like you unlof, that you then use this study for whatever reason, I think the ALJ says this, or maybe it might be the board and it's adoption says, listen, this study may probably started out completely legitimately, but it devolved into a targeted enterprise looking to root out union activists. I think you're absolutely right. This wasn't about the, at the outset of the study, Melgar says, or he describes the study as he's looking for positions. He's trying to understand what positions are driving the over, what positions are driving the overtime. And he ultimately makes no conclusion on a position. He makes several findings as they relate to specific individuals. So I think, I mean, your honor said it, that it's incredibly fishy. And I don't think there's a way the employer can get around that. And that's not even, that's not even the end of it, right? There's the investigations that don't follow a typical pattern. They don't, they don't do everything they normally do. They don't investigate anything afterward. They don't look at HR records. They don't talk to, they don't look at the scheduling records. They don't ask the supervisors, hey, these three employees are saying they were on union time. Are they, are they expected to be in the facility? There's none of that. So certainly it starts with an incredibly fishy study. And then as we point out in our brief, it continues along an incredibly suspect path that, frankly, I don't think there has been offered any explanation for all of these highly irregular actions that were taken that resulted in the termination of the three most active union, union- Ms. Sheehy, excluding the five or six that are mentioned in this case, subtracting that from the 59, does the record indicate of the remaining 50-odd number, how many were union members and how many were non-union members? I don't believe it, well, union, well, I believe they were all union members. Well, I believe they were all Borg Union employees. I think he's not studying management. All right, let me rephrase it then. Of the remaining number, does the record reflect how many of them who were not eventually discharged were activists versus non-activists in the union sense? I don't believe it clearly does. It's possible because some of the union officials testified as to the existence of other stewards. How many stewards were they? I don't recall that their names were articulated into the record, but you'd have, there's no document. You'd have to piece that together. You'd have to review the testimony of, say, Vlachy, and if Vlachy said, yes, Barb Sheehy's also a union activist, and then you'd have to look at the list. So it's possible it could be pieced together from the record. I don't think- Well, there's only, if the focus is only 59, is it difficult to find out their names? I mean, how did we arrive at the 59? The 59, there's a chart, Melgar, and that's in the record. So Melgar's 59 employees. What I'm saying is I don't know that, so some of the shops had 30 stewards, for instance, I believe. And I think some of their names are mentioned in the record, but not, there's not a comprehensive document that says these, as far as I know, and union counsel can correct me, that if these are the 30 stewards, and let's have a look at, and compare that to the 59. So I'm unaware of that and I think that's an accurate reflection. But I'm at a little bit of a loss to understand why we don't have some sort of study of the others as to whether they fit the profile of the three that were discharged or not. I mean, respectfully, that would have been up to the employer to do, so rather than focus on whether we know they were union activists, I think the first, before you get to that question, should be, why didn't you even look at them, period? There were five people on this very narrowed list, the ratio, the high ratio list, where it was a function of both turnstile swipes and overtime. There were five people on that list above Lashi. And so rather than, I think that, respectfully, I think you're right, I think I would like to know too, but first, before I want to know they're union activists, I want to know, why didn't you even look at those five people? And then we can figure out were they union activists, weren't they? But as a basic threshold matter, why didn't you care about the five people who had higher ratio issues, according to Melgar's very laborious study, why didn't you look at those people too? And then, like I said, I think you're absolutely right, it would be good to know, are they union activists? But as a threshold matter, I think the employer had an obligation to explain why didn't it look at other people too. Thank you. And there was one other point I wanted to make, and this had to do with another disparate treatment point, but it had to do with, so there's the two prongs of disparate treatment, there's the, they were unlawfully targeted in the study, and then there's the back end of it, disparate treatment in terms of the punishment that was meted out. And I did want to say that the record doesn't contain a single, I don't think, I think this is an accurate statement, I don't believe there's a single document showing that somebody who engaged in any sort of time theft, be it what's been characterized as malicious, or similar to this, who, based on that offense, was terminated. And then there's also testimonial evidence from the three union officials, who I think bear that out as well, they bear out the lack of written documentation. In their experience, I think they each testify to some knowledge of certain infractions involving time and attendance issues, but they all, I believe, uniformly testify that the punishment following that had always been verbal counseling or suspension, I believe. I think somebody has been suspended for it, but to my knowledge, nobody has suffered discharge. Ms. Sheehy, does the board acknowledge, nonetheless, that the three gentlemen that were terminated, Vlashe, Scherer, and Gutierrez, that at some level they did engage in time theft? I don't believe the board does, and I'll tell you why. This, well, first of all, because the investigation, nobody knows whether these employees actually did have permission to be out of the facility. And so you have the three of them, you have Vlashe, who has two union days where he says, I'm allowed to go in and out of the facility, my supervisor's fine with that. And then he has two days where he has an exit, I believe, but not a reentry, two of those. The other one where I think they're saying Vlashe's intent is the worst is actually not something that he was charged with, as far as I understand it. It's the one where there is a successive, like within a millisecond, entrance and then exit or exit and then entrance. That doesn't come into play for his termination. His termination involved two, and this is in the charge, involved two days where he was on union activity and two days where there are long periods of time where he's got an exit but no reentry into the building. And his testimony was, I was working, I don't know why the turnstile swipe doesn't show that. And he's, and then there's some, the question, and the employer, I think, in order to concede that there was actually time theft, I think the employer would have to show, at the very least, it spoke to his supervisor to confirm that there are production reports that are produced that show what individual employees have done during their time when they're on the production line. There's also, so there were multiple ways that the employer, I think, could show beyond just these electronic swipes and coming in and out that, yes, Vlashe was not only off, Vlashe didn't just have a technical error with his turnstile swipe, he was actually out of the building. So that's Vlashe. And then, again, we wouldn't concede that they've demonstrated either that Shearer did. Both of his days were union days. He testified that on the days that he's on union time, he is allowed to be out of the facility, that his supervisor, in fact, had told the security guard who mans the turnstiles that he is allowed to swipe in and out sometimes without, or he's allowed to come and go without the security guard worrying about it because he's doing union work. He testifies that when he does union work, he often goes out to the picnic tables outside and works on his production, or works on his overtime. I think it's a pretty complicated process, actually, to put together all of these shifts and balance out the overtime. So he says he takes his paperwork out to the picnic tables. And then you have Gutierrez, who only, I believe, as far as I understand what he was charged with, he has a single hour of time that the employer says is unaccounted for, that he left the building one hour before his shift ended, and that somebody else swiped him out. So I think under those circumstances, with his testimony being, I just asked this guy to retrieve my wallet, and on top of that, my supervisor says that the one hour, so Gutierrez is a little bit different. He doesn't dedicate full days. He does the last hour of his shift. He's allowed to cover overtime work. So in short, I know that was a very long answer to would we concede that there was time theft. I would say that no, the board does not at all, that the evidence in the record does not support that. And I just have one quick thing I'm going to say before I'm going to turn it over to Union Council. I just wanted to clarify the information requests. The check-in, check-out, the violation there on the information request, this is the May 13 request, is that it was an unreasonable delay. Unreasonable delay. The employer had an obligation to say this was such a voluminous request, we can't possibly do it in a reasonable period of time. They didn't do that. They didn't provide the full request information until January. And so that's not a refusal to timely furnish. And the second one, the new hire, is a refusal to furnish in its entirety. I know the employer has said that it's positioned that they supplied that information. The board found otherwise and they don't take issue with that in their brief. What they argue is that there were other things that affected whether they should provide it. So an oral argument, he certainly can't advance now that the employer takes issue with having provided. Thank you, Ms. Sheehy. Thank you. We'll now move to Mr. Schifrin on behalf of the union. Mr. Schifrin. Hi. Good morning, your honors, and may it please the court. The board found in this case unanimously that and explicitly that the record evidence amply established a causal relationship between the union officials, union activities, and the discipline that they receive. That the evidence is substantial and there's nothing, there's not an opportunity given the evidence in the record for this court to second guess the board's findings in that regard. And I want to focus on three pieces of evidence which have been the subject of most of the questions this morning and I think will respond to much of what Mr. Shuroff has said. First of all, the union, there's evidence and the ALJ and board found that the union officials were singled out in a study by Mr. Melgar, which was also a pretextual study. Second, that this was the first time in the history of the plant that anyone had ever been fired for a first-time time theft offense. Rather, there's ample evidence of progressive discipline at the plant. And third, the three union officials were each denied an opportunity to respond to the allegations that the company had made. Let me unpack what I'm saying. On the overtime, so the so-called overtime study, and we call it so-called overtime study in our brief, because the study that Mr. Melgar was performing had nothing to do with the drivers of overtime. The record is that overtime at the plant is determined by the number of bodies you need to run the line when management determines they want to run the line. It's not like a paralegal who works late and bills the law firm and the is determined by you need a certain, you'd say 11 people to run a part of a facility, and you need to make sure you have enough people in there to do that. And when the plant runs on the weekend, all of those hours are overtime hours, and that's just a management decision to run certain lines on the weekend. So there's no connection between time theft and overtime, and the report makes none. And Mr. Melgar in his testimony doesn't claim that there was. Instead, he says that this examination of time theft was essentially a diversion from his overtime study. So whenever he began it, it was irrelevant. It was a diversion, and then he never got back to be honest, I never finished that part of the study because these findings, they were bigger than the original intent. They were a byproduct of my original intent. So that describes some of the pretextual nature of this report. There's also very clear evidence in the record that the union officials were singled out. This list of 59 employees, which really, if you look at the records, is a list of 56 employees, are employees who had over 80 hours of overtime in some of the weeks. I'll say Mr. Melgar said he chose a random set of weeks, and in those random set of weeks, he looked at employees who had more than 80 hours of time, and not just overtime, but time doing production work or time built to the company. Mr. Vlasche was on that list, and Mr. Sher was on the list. Mr. Gutierrez was not on that list. And there's nothing in the record, Your Honor, to answer Judge Flom's question about the union activities of the others on that list. So we're not able to do that comparison that you suggested. And let me say that these three union officials were unique in their union activity in the months leading up to their discipline. This wasn't business as usual at the plant. In February of 2016, the contract had expired, and the union was engaged in a campaign, part of a national boycott campaign for a new contract, and the company was engaged in making changes to practices that have been established at the plant. And the three union officials were, in ample evidence, were leaders of that campaign and had multiple confrontations with plant management and were seen as strong union leaders in the plant. And so the fact that it's the three of them and not surprising. But so back to the report. Mr. Melgar looks at the records for Nafis Vlasche, and he looks, he says, at the records for Nové Korostovsky. When I say the records, he's focused on the turnstile records. And turnstile records means electronic records of when someone uses their ID badge to swipe through the turnstile at the employee entrance of the plant. And determines based on when people have ins and outs recorded on the turnstile, or when they have consecutive ins or consecutive outs, that they were out of the plant for unauthorized purpose, and that's time, that's the basis of his conclusion, his reliance on the turnstile. If you look at the records of those 59 employees, there are many, many that have the same type of discrepancies, either what looks like extended absences or consecutive ins and outs that Mr. Melgar did not examine. And the ALJ reasonably found based on his testimony, which was evasive on this point, that he did not examine. 29 of the 56 employees had what looked like extended absences, adding up to 122. 40 of the 56 employees had 306 consecutive ins and outs, and this is detailed in our brief. So it's, for Mr. Melgar to spend his time looking at the union officials versus all of this other data, there was employees who had, one employee had, he says that he looked at Nové Korostovsky because he had one instance of coming into the office and watched hours of video related to Nové Korostovsky to figure out what happened. There was another employee named Rosanna Bianco who had eight of those in a row, and another employee, Kathy Moore, who had 15 outs without an in. He has no explanation, he had no explanation for why he didn't examine those employees for the same level of scrutiny as he did the union. So that illustrates well and provides substantial evidence in the record to support the board's conclusion that the three union officials were singled out. On the question of disparate treatment, I see that my time is up, I appreciate it. On disparate treatment, I'll say there's 26 examples in the record of other employees who received time for that discipline, and the ALJ examined that evidence and found that it was mostly counseling and written warnings and some suspensions, and there was clear progressive discipline at the plant. There's nothing to suggest that there's anything different between the cases, these cases, even if you were to accept the allegations as true, and those other cases. In fact, there's people who were disciplined that same day for, I see that my time is expired, thank you very much. Well, thank you, Mr. Shiffrin. Mr. Shudroff, we'll go back to you for your rebuttal time. Yes, thank you, your honors, and one thing that I think that both the board and the union have said during their presentations is they focused on this overtime study as a some kind of pretextual basis for singling out these three union activists, Vlashe, Gutierrez, and Scherer, but there's no evidence, much less substantial evidence, to support the conclusion that Melgar knew of their union activities, or that anybody told him to focus on those three individuals. So the fact that they may have been uncovered is not suggesting that there was any kind of unlawful reason that they were being focused upon in this case, and once the person was, once Melgar was able to uncover them, that's where this whole disciplinary investigation initiated, because of the time theft nature of the offenses. Mr. Shudroff, I think that's a fine response on your part, but don't you have to go further, and don't you have to respond to Mr. Shiffrin's point that, well, there were many other employees on the original list of 59, when you look at their pattern of timekeeping, that their pattern resembled that of at least Mr. Vlashe, and they did not end up on any narrowed list? I believe the record shows that Mr. Melgar viewed all the video available video evidence for the 59 employees where it was available, and only those who were found to be outside of the building were the ones who were, for extended periods of time, were then focused upon, and that's how this group of people were discovered. So you're not so much challenging Mr. Shiffrin's point that there's others just on the basis of the data alone that look like they have similar timekeeping irregularities. What you're saying is that Melgar narrowed it based upon the availability of video evidence. That's correct, Your Honor, and that's how he was able to then determine where there were potential improprieties. Why would video evidence be available for the 59 employees? Because those were the people who were going outside quite a bit, and he did examine certain video, which I believe exonerated certain individuals, but it wasn't for the, in other words, with respect to the three discriminatees, those people were outside of the building for a significant period of time, and that's what ultimately led to their further investigation. So in this case, though, the board, what the board is doing is it's really second-guessing the company's investigation techniques here. The board and the union don't get to do that. It's not as if there's a prescribed method, because otherwise, if we went by what the board and the union were saying, we would always, they would be the ones to be determining what would be considered fair, and that's a completely subjective determination in this case. There's another layer here, though, Mr. Shudroff, because we're not under de novo review. We're under substantial evidence, and Judge Schuh's opinion here obviously sets a table that you then have to deal with. So I see your argument with regard to the nature of a potential de novo review, but how does that factor in the substantial evidence and review? So as far as just that there's no, that the investigation itself, that there's not substantial evidence to suggest that there was anything improper about the actual investigation. I mean, each of the union officers, as well as the two non-discriminate, I'm sorry, yes, the two non-discriminatees were offered interviews to provide their input as to what their whereabouts were, and the company did not find them to be credible, and that's what ultimately led to their suspensions and ultimate terminations. There's nothing unfair about the investigations. If these, as Mr. Shiffrin pointed out, these people were the strong shop stewards. If they were really strong, they would have been able to provide their whereabouts. The same thing goes for the union business excuse. If they believe that they were on union business, if that's what was the actual explanation for their, you know, the lack of whereabouts, that would be something that they would probably have, it would seem fair to presume that they would have explained to the people who were investigating them, hey, I was on union business that day, or I was on union business that time, and here's the explanation as to why. But that doesn't come out from the union officers, and even until later on at the hearing. So it can't be simply that that's the explanation. What happened here was the company determined that those individuals did not provide credible explanations and would have terminated them for time theft regardless of their union activities, even presuming there was a level of animus here. And also from that point, the animus here was generalized. It wasn't, and there was no causal connection between the animus and the adverse employment actions. And your honors, I see that my time has concluded. Thank you, your honors. Unless there are other questions. Thank you, Mr. Shudroff. Thank you, Ms. Shih. Thank you, Mr. Shiffrin. The case will be taken under advisement.